**Opinion issued June 28, 2018**



**In The**

# Court of Appeals

**For The**

# First District of Texas

———————————

**NO. 01-17-00331-CR**

———————————

**JOHN HOLT CRAMBELL, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

---

**On Appeal from the 184th District Court**
**Harris County, Texas**
**Trial Court Case No. 1471924**

---

**MEMORANDUM OPINION**

A jury convicted appellant, John Holt Crambell, of the first-degree felony offense of aggravated sexual assault.[1] After finding the allegations in an

---

[1] *See* TEX. PENAL CODE ANN. § 22.021(a) (West Supp. 2017).

enhancement paragraph true, the jury assessed appellant's punishment at twenty-eight years' confinement. In two issues, appellant contends that (1) the trial court erred by failing to include in the jury charge an instruction on the lesser-included offense of sexual assault and (2) the trial court erroneously denied appellant his right to impeach the complainant with a prior charge of filing a false report.

We affirm.

## Background

### A. *Factual Background*

The complainant, L.D., had problems with drug and alcohol addiction for most of her adult life. Xanax was one of the drugs that she abused. In February 2015, L.D. was separated from her husband and was living in an extended stay hotel in the Sugar Land and Stafford area. L.D. was also engaged in a battle with her parents regarding the custody of her ten-year-old son.

Around 10:00 or 11:00 p.m. on February 27, 2015, L.D. received a call from a friend of hers from rehab who was celebrating his birthday and who asked her to meet him at a club on the east side of downtown Houston. L.D. admitted that, earlier that day, she had consumed methamphetamines, and by the time she received the call from her friend, she was feeling anxious and not euphoric. When L.D. arrived at the club, she found her friend, who was in his twenties, with a large group of teenagers. All of these individuals seemed intoxicated. L.D. tried to convince her

2

friend to leave, but he refused, and she decided to stay at the club and wait for him. L.D. admitted to smoking "a little" marijuana with someone while she waited at the club. She denied consuming any other drugs or any alcohol while out that night.

L.D. mostly stayed near her car while she was at the club. At some point in the night, she met appellant, who introduced himself to her as "John Holt." L.D. did not identify herself by her first name, but instead gave appellant a nickname. Throughout the course of the evening, she witnessed appellant selling drugs to other people at the club. L.D. stated that appellant seemed "off putting" and intimidating at first, but he was also very friendly and charming, and, during their conversation at the club, which lasted at least forty-five minutes, L.D. began to trust him.

L.D. was feeling anxious while she was at the club, and she asked appellant if he could find her some Xanax. Appellant said that he would try, and he suggested that they go back to his apartment, which was nearby. Appellant and L.D. left the club in L.D.'s car, with L.D. driving. They stopped at a gas station on the way to appellant's apartment so L.D. could use the restroom. Unbeknownst to L.D. at the time, while she was inside the gas station, appellant rifled through the glove compartment of her car and put all of its contents—including L.D.'s car title, insurance information, and prescription sleep medication—into a backpack he had been carrying with him.

3

L.D. then drove to appellant's apartment. L.D. remained in her car for around thirty minutes while appellant went inside his apartment. When appellant came back outside and got back in L.D.'s car, he confronted her and told her that he knew she had given him a fake name, and he told her that he knew her real name, that she lived in Sugar Land, and he "started rattling off a lot of details about [her] life that [she] had no idea how he could possibly know." L.D. was confused, but appellant would "sandwich those comments [about her life] in with like comforting comments and friendly comments," so, while she felt threatened by appellant, she decided to stay with him in the hope that he would still provide her with Xanax.

Appellant directed L.D. to return to the club where they had met, and, while there, L.D. saw appellant sell methamphetamine to several people. They had been at the club for about thirty minutes when appellant told L.D. to get back in the car because he wanted to show her something, and they left again. L.D. was still driving her car at this point. Appellant directed L.D. to an area east of downtown Houston that had a field, some upscale condominium complexes, and a railroad track. Appellant told L.D. that they needed to wait at this location because he had "his people working on" finding them some Xanax. They waited at this location for around forty-five minutes, and then appellant suggested that his sister might be able to help them find Xanax, and appellant made a phone call. L.D. testified that she

4

"believed with all [her] heart [appellant] was on a mission to help [her] out, like he was really trying."

Appellant offered to drive L.D.'s car to his sister's house, and L.D. allowed him to do so. Appellant's sister lived in Katy, Texas, and they started driving in that direction from downtown Houston on I-10. On the way to appellant's sister's house, appellant stopped at a branch of L.D.'s bank so that she could make a withdrawal in order to pay for the Xanax. Because appellant was in the driver's seat, L.D. gave appellant her debit card and her PIN, and appellant made the transaction. Appellant returned L.D.'s debit card to her, but he kept the cash that he had withdrawn from her account.

Appellant and L.D. arrived at appellant's sister's house around 6:00 a.m. Appellant's sister told them that she could probably help them out, but she would not be able to get any Xanax until around 9:00 a.m. Appellant suggested that they wait, but L.D. told him that she did not want to wait and that she preferred to go back to downtown Houston.

On the way back to downtown Houston, appellant stopped at a gas station and took the keys to L.D.'s car with him inside the station. L.D. waited in the car for around fifteen to twenty minutes, and while she was waiting, she looked inside the glove compartment and discovered that it was empty. L.D. had put her prescription medication in the glove compartment earlier that evening before she left her hotel

5

for the club, and she realized that appellant must have emptied the glove compartment when she used the restroom before going to appellant's apartment and that this was how he had suddenly known personal information about her. L.D. went inside the gas station. She thought about telling the gas station attendant what was going on, but instead she found appellant using the money that he had withdrawn from her bank account to play gambling machines.

L.D. tried to convince appellant to get back into her car, but he only agreed after he had spent all of her money on the gambling machines. Appellant agreed to drive L.D. back to downtown Houston. While they were in the car heading towards downtown on I-10, L.D. confronted appellant about the missing contents of her glove compartment. Appellant's behavior "shifted" and he became very angry, demanding to know how L.D. could accuse him of such actions after all of the private information of his own that he had shared with her that evening. L.D. tried to appease appellant, telling him not to worry about the medication that he had taken from the glove compartment, but he remained angry for the rest of the trip downtown.

When they arrived at downtown Houston, appellant drove to an area on the east side of downtown that had a combination of fields, warehouses, and condominium complexes. Appellant pulled off of a dead-end road and into a loading dock, where he parked L.D.'s car. Appellant said, "I'm tired of waiting. Take your top off." Appellant then pulled a knife with a retractable blade out of the left-front

6

pocket of his pants and held it in his left hand, resting his hand on his leg. L.D. complied with his demands to remove her shirt and her bra, but when she tried to cover her breasts with her arms, appellant told her, "I'm not going to tell you again. If I have to tell you again, you're going to be in trouble. Don't cover yourself. Stop covering yourself." The knife remained in appellant's hand while he forced L.D. to undress.

Appellant then decided to back L.D.'s car out of the loading dock, and he drove it to the adjacent street and parked facing a field. Appellant held the knife to L.D.'s neck and ran it down her back, and he told her to undress completely. L.D. could feel the knife touching her back, but appellant did not cut her with the knife. L.D. complied with his demand to undress. Appellant then told her to do whatever he wanted her to do or he "was going to bury [her] in that field across the way." He then forced L.D. to perform oral sex on him, and he held the knife against her back during this act. At one point, L.D. stopped and sat up, and appellant, while still holding the knife against her back, put his fingers in her vagina.

Appellant demanded that L.D. move to sit on top of him, but she refused due to the limited amount of space in the driver's seat of her car. Appellant again threatened her by telling her that he was going to "bury [her] in the field." He continued holding the knife against her back and against her throat while they spoke. L.D. then faked a seizure and, in the ensuing confusion, managed to grab her tank

top and her purse and get out of her car. L.D., while undressed and holding her tank top against her chest, started running down the street. Appellant started her car and began following her down the road.

A truck turned onto the road, and L.D. attempted to get the driver to stop and help her, but the driver rolled down the window halfway and "shooed [her] away." Appellant kept following her in her car and continuously hollered at her, saying things like, "Baby, get in the car." Appellant stepped out of the car and again demanded that L.D. get back in the car. L.D. told him to throw the knife to her, and appellant did so. The knife landed on the ground, and L.D. picked it up and threw it into some nearby brush. She then immediately started running toward a condominium complex, and she saw a woman outside walking her dog. L.D. screamed for help, and the woman picked up her dog and ran back inside her apartment.[2]

L.D. managed to run into the condo complex where she hid around the corner of a building and put her tank top on. She saw appellant, who had still been following

---

[2] This woman, Abbey Gill Quattlebaumh, was outside walking her dogs on Melva Street, east of downtown Houston, when she saw L.D. on Clinton Street, which ran parallel to Melva, running down the street with no clothes on, screaming for help, and being followed by a car. She saw L.D. unsuccessfully attempt to get the truck driver to stop and help her. Quattlebaumh realized that she did not have her cell phone with her, nor did she have any kind of weapon, so she ran back to her house and immediately called 9-1-1. The trial court admitted Quattlebaumh's 9-1-1 call into evidence.

her in her car, drive away and leave the area.[3] L.D. then saw another woman, Akia Penson, leaving the condos. L.D. ran toward Penson's car, and Penson rolled down her window. L.D. described what had happened to her and asked if Penson could call 9-1-1. Penson did so, and both women spoke to the 9-1-1 dispatcher. Penson brought clothes and a blanket for L.D., and she waited with L.D. until the police arrived.

Houston Police Department Officer D. Von Quintus was in the area and responded to the 9-1-1 calls. L.D. relayed what had happened to her, and she told Officer Von Quintus that "John Holt" was responsible. L.D. also told Officer Von Quintus that appellant had used a knife during the assault and that he had thrown the knife from the car, and she pointed to the area where she had tossed the knife. L.D. saw Officer Von Quintus search the area that she had indicated, and when he held up a knife, L.D. identified the knife as the one appellant had used. The trial court admitted the knife recovered by Officer Von Quintus into evidence, and L.D. identified this knife at trial as the one used during the assault.

Officer Von Quintus admitted at trial that he was not wearing gloves when he picked up the knife. He stated that the knife was in the "open" position when he picked it up, and, at some point, he closed the knife. Upon examining the knife at

---

[3] L.D. and her husband later searched for her car, and it was ultimately found around the corner from appellant's apartment.

trial, Officer Von Quintus agreed with the State that the knife appeared to have a "few little spec[k]s" of rust on the blade. He testified that he found the knife lying on top of grass and that it appeared to him that the knife had been laying there for a short period of time. Officer Von Quintus also admitted that he did not take any pictures of the knife as he found it on the grass because his camera was in his patrol vehicle at the time and not with him. He further stated that because he did not have any envelopes for storing evidence with him at the time, he placed the knife in a "little side pocket" of his patrol vehicle before submitting the knife as evidence when he reached the station. Officer Von Quintus also testified that, in his initial written report, he wrote that L.D. told him that she had grabbed the knife away from appellant before throwing it away into the brush.

Detective J. Roscoe was assigned to investigate this case. Detective Roscoe initially had difficulty determining who the suspect was because appellant had given L.D. his first and middle names—John Holt—but not his last name. After Detective Roscoe's interview with L.D., he obtained surveillance photographs and video showing L.D. and appellant at L.D.'s bank. Detective Roscoe used one of the surveillance photographs to show to individuals in the area around where L.D. had said appellant lived, and he learned where appellant worked. Upon visiting that location, Detective Roscoe obtained appellant's full name, and he was able to

compile a photo-array to show to L.D. L.D. made a tentative identification of appellant in the photo-array.[4]

Shamika Kelley, a forensic DNA analyst at the Houston Forensic Science Center, analyzed several pieces of evidence pertinent to this case, including swabs from L.D.'s car, swabs from the knife recovered by Officer Von Quintus, and a buccal swab from appellant. Kelley testified that two swabs were taken of the knife: one from the handle and one from the blade. The swab of the knife's handle revealed a mixture of at least three contributors of DNA, and at least one male contributor. Kelley testified, "[T]here were too many contributors in order to make a conclusion on this item." Thus, Kelley made no determination regarding who contributed DNA profiles to that swab. With regard to the swab from the blade of the knife, Kelley obtained no DNA profile.

## B.    *Trial Proceedings*

The State filed a pretrial motion in limine seeking to exclude evidence that L.D. had been charged with filing a false report to officers in Fort Bend County in 2012 because this charge had later been dismissed for insufficient evidence. The parties discussed this prior charge in a pretrial hearing. The State informed the trial

---

[4]    L.D. testified that she was "95 percent" certain of the identification she made in the photo-array. She stated that she thought the picture of appellant "looks like" the man who assaulted her, but appellant was "very gaunt" in the picture used in the photo-array and weighed more when she met him. She testified that she told this to Detective Roscoe, and he advised her to write "tentative" above appellant's picture.

11

court that the charge arose out of a 9-1-1 call made by L.D. in which she stated that her husband, who was living with a friend at the time, was suicidal, but when the police arrived at the house where L.D.'s husband was staying, her husband denied that he was suicidal. After further investigation, charges against L.D. were dismissed, and she was not convicted of filing a false report.

Defense counsel argued that the prior charge might become relevant later in the proceedings because L.D. lied to Detective Roscoe during her initial interview with him, omitting the information that she had been with appellant because she was attempting to buy drugs. Counsel argued that L.D. has "a habit of lying to the police." The trial court noted that lying to the police is relevant, although it "might be understandable people do that when they're looking for drugs." The trial court then stated:

> [The prior charge is] not your typical false report to a police officer. So, right now it looks to me like that's not very relevant. And if the case was dismissed, I really do find it's not too relevant. Of course, I can look at it later based on the state of the record, but at this time I don't see that it has much probative value. And it has lots of prejudicial value.

The trial court ordered the parties to approach the bench before discussing L.D.'s prior false report charge.

At trial, L.D. admitted that initially she was not completely truthful in her interview with Detective Roscoe because, in recounting what had happened to her with appellant, she "diverted attention away from the fact that [she] was trying to

12

buy drugs." When Detective Roscoe confronted her about being less than forthcoming, she admitted that she was involved in an active case with her parents over the custody of her son, and she admitted that she and appellant were together because they had been searching for Xanax. Detective Roscoe testified similarly that, during his interview with L.D., he confronted her because he felt as though there was something missing from her account of events and she was not telling him everything. He agreed that, eventually, L.D. told him about her quest to purchase Xanax with appellant.

The State had the following exchange with Detective Roscoe:

The State: After [L.D.] provided further information during her statement, did her story in your mind start to now make sense?

Roscoe: Yes.

The State: And at any time was she charged with giving a false statement to the police?

Roscoe: Not—not for this, no.

The State: For this offense is what I'm asking.

Roscoe: Correct.

The State: She wasn't charged with that for omitting certain things in her statement?

Roscoe: That's correct.

Outside the presence of the jury, defense counsel argued that, by asking those questions of Detective Roscoe, the State had opened the door to evidence concerning L.D.'s prior charge for filing a false report. Defense counsel requested that he be

13

allowed to question Detective Roscoe about his confronting L.D. over her prior false-report charge.

The trial court asked the attorneys additional questions about L.D.'s prior charge. Defense counsel had a copy of the offense report, and he informed the trial court that L.D. had called the Fort Bend County Sheriff's Department claiming that her husband was trying to commit suicide. Officers spoke with L.D.'s husband and his roommate, and the officers determined that L.D.'s report was false. Defense counsel represented that the offense report included additional information about L.D.'s drug abuse, as well as information about her marital problems and alleged threatening and harassing messages that L.D. had sent to her husband. Defense counsel also represented that the case was dismissed because L.D.'s husband later decided he did not want to prosecute. It was undisputed that the charge was dismissed and L.D. was never convicted of filing a false report. The trial court ruled that because L.D. did not plead guilty, was never found guilty, and did not have a conviction for filing a false report, the prejudicial effect of the prior charge outweighed the probative value.

During the charge conference, defense counsel requested that the trial court instruct the jury on the lesser-included offense of sexual assault. The following exchange occurred with the trial court:

| | |
|---|---|
| The Court: | Okay. And what evidence is there in the record that there was no knife used? Since the complainant said it was used and it was recovered. |
| Defense counsel: | Well, Your Honor, because the credibility is solely at stake because there are no cuts, there are no abrasions, no lacerations, or anything on her body indicating that a deadly weapon was used, the jury may believe that a sexual assault took place; but they may believe that a deadly weapon was, in fact, not used. |
| | His fingerprints, his DNA, is not on that knife. So, that is a contested issue. So, I believe that there is, you know, some room for the Court to include the lesser included offense of sexual assault. It's the jury's decision to determine if it's aggravated assault or not—aggravated sexual assault, Your Honor. |

The trial court stated that it did not "see any basis to give the lesser," and it refused to give the requested lesser-included offense instruction.

During deliberations, the jury sent the following request: "Can we see the section of the testimony from [L.D.] regarding when the knife was thrown from the vehicle?" The jury also requested to review "the testimony from Officer Von Quintus regarding the knife." Ultimately, the jury found appellant guilty of the offense of aggravated sexual assault, and, after finding the allegations in an enhancement paragraph true, it assessed his punishment at twenty-eight years' confinement. This appeal followed.

15

## Lesser-Included Offense

In his first issue, appellant contends that the trial court erred by denying his request to instruct the jury concerning the lesser-included offense of sexual assault. Specifically, appellant contends that there was "compelling evidence" to support the conclusion that he did not use a deadly weapon while sexually assaulting L.D.

### A.      *Governing Law*

Code of Criminal Procedure article 37.09 pertains to lesser-included offenses and provides that an offense is a lesser-included offense if:

> (1)      it is established by proof of the same or less than all the facts required to establish the commission of the offense charged;
>
> (2)      it differs from the offense charged only in the respect that a less serious injury or risk of injury to the same person, property, or public interest suffices to establish its commission;
>
> (3)      it differs from the offense charged only in the respect that a less culpable mental state suffices to establish its commission; or
>
> (4)      it consists of an attempt to commit the offense charged or an otherwise included offense.

TEX. CODE CRIM. PROC. ANN. art. 37.09 (West 2006).

Courts apply a two-step analysis to determine whether an instruction on a lesser-included offense should be given to the jury. *State v. Meru*, 414 S.W.3d 159, 162 (Tex. Crim. App. 2013); *Cavazos v. State*, 382 S.W.3d 377, 382 (Tex. Crim. App. 2012). The first step of this analysis is a question of law that does not depend on the evidence at trial and compares the elements of the offense as alleged in the

16

indictment with the elements of the requested lesser-included offense. *Meru*, 414 S.W.3d at 162; *see Hall v. State*, 225 S.W.3d 524, 535–36 (Tex. Crim. App. 2007) (holding that first step in lesser-included offense analysis must be "capable of being performed before trial by comparing the elements of the offense as they are alleged in the indictment or information with the elements of the potential lesser-included offense"). The question at this step is, "[A]re the elements of the lesser offense 'established by proof of the same or less than all the facts required to establish[] the commission of the offense charged'?" *Ex parte Watson*, 306 S.W.3d 259, 264 (Tex. Crim. App. 2009) (quoting TEX. CODE CRIM. PROC. ANN. art. 37.09(1)). Courts compare the statutory elements and any "descriptive averments," such as "non-statutory manner and means[] that are alleged for purposes of providing notice," alleged in the indictment for the greater offense to the statutory elements of the lesser offense. *Id.* at 273 (op. on reh'g) (per curiam).

If the analysis under the first step supports a conclusion that the defendant's requested lesser offense is a lesser-included offense, the court moves to the second step of the analysis and considers whether a rational jury could find that, if the defendant is guilty, he is guilty only of the lesser offense. *Meru*, 414 S.W.3d at 162–63. This step is a factual determination that is based on the evidence presented at trial. *Id.* at 163. If there is evidence that raises a fact issue on whether the defendant is guilty only of the lesser offense, a lesser-included offense instruction is warranted,

17

"regardless of whether the evidence is weak, impeached, or contradicted." *Id.*; *Hall*, 225 S.W.3d at 536 ("In this step of the analysis, anything more than a scintilla of evidence may be sufficient to entitle a defendant to a lesser charge."). The evidence must establish the lesser offense as a "valid, rational alternative to the charged offense." *Hall*, 225 S.W.3d at 536 (quoting *Forest v. State*, 989 S.W.2d 365, 367 (Tex. Crim. App. 1999)). The evidence may be "weak or contradicted," but it "must still be directly germane to the lesser-included offense and must rise to a level that a rational jury could find that if [the defendant] is guilty, he is guilty only of the lesser-included offense." *Cavazos*, 382 S.W.3d at 385. To meet this threshold, the evidence must be more than mere speculation; this threshold "requires affirmative evidence that both raises the lesser-included offense and rebuts or negates an element of the greater offense." *Id.*

## B.    Analysis

In the first step of the lesser-included offense analysis, we consider the statutory elements of aggravated sexual assault as these elements were modified by the particular allegations in the indictment:

(1)    the appellant

(2)    intentionally or knowingly

(3)    caused the penetration of L.D.'s mouth by his sexual organ

(4)    without the consent of L.D.

(5)    appellant compelled L.D. to submit and participate by threatening to use force and violence against L.D.

18

(6)    L.D. believed appellant had the present ability to execute the threat

(7)    in the course of the same criminal episode, appellant used and exhibited a deadly weapon, a knife.

*See* TEX. PENAL CODE ANN. § 22.021(a)(1)(A)(ii), (2)(A)(iv) (West Supp. 2017) (setting out elements of aggravated sexual assault); *see id.* § 22.021(c) (providing that aggravated sexual assault is without consent of other person if aggravated sexual assault "occurs under the same circumstances listed in Section 22.011(b)," which describes when sexual assault is without other person's consent).

We then compare these elements with the elements of the lesser offense of sexual assault that could be included in that offense:

(1)    the appellant

(2)    intentionally or knowingly

(3)    causes the penetration of the mouth of another person by his sexual organ

(4)    without that person's consent

(5)    appellant compels the other person to submit or participate by threatening to use force or violence against the other person

(6)    and the other person believes that appellant has the present ability to execute the threat.

*See id.* § 22.011(a)(1)(B), (b)(2) (West Supp. 2017). Here, the only difference between the elements of the lesser offense of sexual assault and the offense of aggravated sexual assault as charged in the indictment is that, to establish aggravated sexual assault, the State was required to prove that appellant used and exhibited a

19

deadly weapon, a knife, during the course of the same criminal episode. In this case, the elements of the lesser offense of sexual assault are "established by proof of the same or less than all the facts required to establish the commission of the offense charged." *See* TEX. CODE CRIM. PROC. ANN. art. 37.09(1); *Ex parte Watson*, 306 S.W.3d at 273 (op. on reh'g). We conclude that, in this case, sexual assault is a lesser-included offense of aggravated sexual assault.

We therefore turn to the second step of the lesser-included offense analysis: whether, considering the evidence presented at trial, a rational jury could find that, if appellant is guilty, he is guilty only of the lesser offense of sexual assault. *See Meru*, 414 S.W.3d at 162–63.

Appellant contends that there is evidence in the record that, if he was guilty, he was guilty only of the lesser offense of sexual assault because "there was a question with regard to the use of a knife" during the assault on L.D. Specifically, appellant points out that the knife was rusted in places and was recovered from the ground, not from L.D.'s car; that forensic analysis did not recover appellant's fingerprints or DNA from the knife; and that L.D. had no injuries from a knife. He also points out that, during deliberations, the jury asked to see the testimony from L.D. "regarding when the knife was thrown from the vehicle" and the testimony from Officer Von Quintus "regarding the knife," suggesting that the jury was "skeptical" about appellant's use of the knife during the sexual assault. He thus

20

argues that the record includes some evidence that he did not use a knife during the assault and he was therefore entitled to an instruction on the lesser-included offense of sexual assault. We disagree.

L.D. testified that, after the unsuccessful search for Xanax, appellant drove her car back to the east side of downtown Houston and parked her car in a loading dock. Appellant turned off the car and said, "I'm tired of waiting. Take your top off." L.D. testified that appellant pulled a retractable knife out of the left pocket of his pants and held it, resting on his leg, with his left hand. She stated that, upon seeing the knife, she complied with appellant's demand to undress.

L.D. testified that appellant then backed her car out of the loading dock and stopped on the street next to the loading dock, facing a field. Appellant then held the knife to the back of L.D.'s neck, ran it down her back, and told her to undress completely. L.D. stated that she could feel the knife on her back, but appellant did not cut her with the knife. L.D. undressed, and appellant told her to follow his demands or he would bury her in the field the car was facing. Appellant then forced L.D. to perform oral sex on him, and he also penetrated her with his fingers. Appellant continued to hold the knife against L.D.'s back and her throat throughout the assault.

L.D. eventually managed to get out of the car by faking a seizure, and she grabbed her shirt and started to run down the street. Appellant followed her in the

car, demanding that L.D. get back into the car. L.D. told appellant to throw the knife to her, which he did, and she picked it up off the ground and threw it into some brush on the side of the road. L.D. started running again, and appellant again followed her in her car. L.D. hid inside of a condominium complex, and she saw appellant drive away in her car.

L.D. told Officer Von Quintus—the responding police officer—that appellant had used a knife during the assault and that he had thrown the knife out of the car. She pointed to the area where she had thrown the knife, and Officer Von Quintus searched that area. She saw Officer Von Quintus pick up the knife from the brush and hold it up to her, and L.D. indicated to him that that was the knife appellant had thrown from the car. The trial court admitted the knife into evidence, and L.D. identified the knife at trial as the one used during the assault.

Officer Von Quintus testified that when he spoke with L.D. near the scene of the assault, she told him that appellant had used a knife. He testified that L.D. did not have the knife in her possession, but she informed him that she had thrown the knife into a vacant lot and pointed to an area by a tree.[5] Officer Von Quintus recovered a knife from the area to which L.D. had pointed and showed that knife to her. He identified the knife admitted into evidence as the knife he had recovered.

---

[5]     On cross-examination, Officer Von Quintus testified that L.D. initially told him that she had grabbed the knife from appellant and thrown it away while she was running.

Officer Von Quintus stated that the blade of the knife a "few little spec[k]s" of rust on it, but the knife was lying on the grass and appeared that it had been there for a short amount of time. Officer Von Quintus admitted that he was not wearing gloves when he picked up the knife from the ground, that he closed the blade of the knife at some point, that he did not take any pictures of the knife on the grass "the way [he] found it," and that he placed the knife in a "side pocket" of his patrol vehicle because he did not have an evidence envelope with him.

Shamika Kelley testified that she tested portions of the knife for the presence of DNA. Kelley stated that a swab of the top edge and handle of the knife revealed a mixture of DNA profiles, with at least three contributors, and at least one male contributor. Kelley testified that "there were too many contributors in order to make a conclusion on this item" and that no determination was made with regard to that swab. Kelley testified that no DNA profile was found on the swab of the tip and blade of the knife.

To prove the charged offense of aggravated sexual assault, the State was required to prove that appellant caused the penetration of L.D.'s mouth with his sexual organ, without L.D.'s consent, and that appellant "use[d] or exhibit[ed] a deadly weapon," here, a knife, "in the course of the same criminal episode." TEX. PENAL CODE ANN. § 22.021(a)(1)(A)(ii), (a)(2)(A)(iv). The State was not required to present evidence that appellant's fingerprints or DNA was on the knife, nor was

23

the State required to prove that appellant caused bodily injury to L.D. with the knife.[6]

L.D. testified that appellant threatened her with a knife throughout the assault, holding the knife to her back and against her throat while he forced her to perform oral sex on him. She testified that, after she escaped from her car, she convinced appellant to throw the knife to her, which he did, and which she then threw into some nearby brush. L.D. informed Officer Von Quintus of this, and he discovered a knife in the place that L.D. indicated she had tossed the knife. L.D. identified—both at the scene and at trial—the knife that Officer Von Quintus recovered as the knife that appellant used during the assault.

Here, there was no testimony or evidence that appellant did not use a knife during the assault. The evidence that appellant's DNA profile could not be recovered from the knife and the evidence that L.D. did not have any injuries consistent with knife wounds are just that: evidence that appellant's DNA profile could not be recovered from the knife and evidence that L.D. did not sustain a knife wound. To infer that because appellant's DNA profile could not be recovered from the knife

---

[6]   One of the ways in which a person can commit the offense of aggravated sexual assault is if the person "causes serious bodily injury or attempts to cause the death of the victim or another person in the course of the same criminal episode." TEX. PENAL CODE ANN. § 22.021(a)(2)(A)(i). The State did not, however, charge appellant with this particular manner and means of committing aggravated sexual assault. Instead, the aggravating element included in the indictment was whether appellant "used and exhibited a deadly weapon, namely a KNIFE." *See id.* § 22.021(a)(2)(A)(iv).

and because L.D. did not sustain a knife wound, appellant therefore did not use or exhibit a knife during the sexual assault of L.D. is entirely speculative. *See Cavazos*, 382 S.W.3d at 385 (stating that, to entitle defendant to lesser-included offense instruction, evidence raising lesser offense must be more than mere speculation).

Evidence raising a fact issue on whether a defendant is guilty only of the lesser offense may be weak or contradicted, but it must establish the lesser offense as a "valid, rational alternative" to the charged offense and it must be "directly germane to the lesser-included offense." *See id.* This standard thus requires "affirmative evidence that both raises the lesser-included offense and rebuts or negates an element of the greater offense." *Id.* Such affirmative evidence is not present here.

We conclude that the trial court did not err when it refused to include an instruction on the lesser-included offense of sexual assault. *See Meru*, 414 S.W.3d at 162–63 (stating that defendant is entitled to instruction on lesser-included offense if, based on some evidence presented at trial, rational jury could find that if defendant is guilty, he is guilty only of lesser offense).

We overrule appellant's first issue.

### Exclusion of Evidence of Prior Charge

In his second issue, appellant contends the trial court erroneously denied him his right to impeach L.D. with a prior charge for filing a false report. Specifically, appellant argues that the State opened the door to this impeachment when the State

25

asked Detective Roscoe if "at any time was [L.D.] charged with giving a false statement to the police," and Roscoe responded, "[N]ot for this, no."

## A. *Standard of Review*

We review a trial court's decision to admit or exclude evidence for an abuse of discretion. *Henley v. State*, 493 S.W.3d 77, 82–83 (Tex. Crim. App. 2016); *Harris v. State*, 152 S.W.3d 786, 793 (Tex. App.—Houston [1st Dist.] 2004, pet. ref'd) (stating that trial court must be given wide latitude in its decision to admit or exclude evidence and appellate courts should exercise "reluctance" in deciding to reverse trial court's decision). A trial court abuses its discretion only when the court's decision was so clearly wrong as to lie outside the zone within which reasonable persons might disagree. *Henley*, 493 S.W.3d at 83 (quoting *Taylor v. State*, 268 S.W.3d 571, 579 (Tex. Crim. App. 2008)); *Binnion v. State*, 527 S.W.3d 536, 545 (Tex. App.—Houston [1st Dist.] 2017, pet. ref'd).

Texas Rule of Evidence 403 provides that a trial court may exclude otherwise relevant evidence if its probative value is substantially outweighed by a danger of unfair prejudice, confusing the issues, misleading the jury, undue delay, or needlessly presenting cumulative evidence. TEX. R. EVID. 403. When conducting a Rule 403 analysis, the trial court must balance:

> (1) the inherent probative force of the proffered item of evidence along with (2) the proponent's need for that evidence against (3) any tendency of the evidence to suggest decision on an improper basis, (4) any tendency of the evidence to confuse or distract the jury from the main

issues, (5) any tendency of the evidence to be given undue weight by a jury that has not been equipped to evaluate the probative force of the evidence, and (6) the likelihood that presentation of the evidence will consume an inordinate amount of time or merely repeat evidence already admitted.

*Gigliobianco v. State*, 210 S.W.3d 637, 641–42 (Tex. Crim. App. 2006). We review a trial court's ruling under Rule 403 for an abuse of discretion. *Pawlak v. State*, 420 S.W.3d 807, 810 (Tex. Crim. App. 2013).

Rule of Evidence 608(b) provides, "Except for a criminal conviction under Rule 609, a party may not inquire into or offer extrinsic evidence to prove specific instances of the witness's conduct in order to attack or support the witness's character for truthfulness." TEX. R. EVID. 608(b); *see Hammer v. State*, 296 S.W.3d 555, 563 (Tex. Crim. App. 2009) (stating that, under Rule 608, witness's general character for truthfulness may be shown only through reputation or opinion testimony, and may not be attacked by cross-examining witness or offering extrinsic evidence concerning specific prior instance of untruthfulness); *see also Pierson v. State*, 426 S.W.3d 763, 771–72 (Tex. Crim. App. 2014) (upholding trial court's decision to exclude evidence of prior allegedly false accusation of sexual abuse because defendant failed to demonstrate that question "was anything more than a prelude to impeachment on a collateral matter and an impermissible attempt to attack the complaining witness's general credibility with evidence of specific instances of conduct")

*B.*     *Analysis*

Here, defense counsel sought to question Detective Roscoe about a prior charge against L.D. for filing a false report to police in Fort Bend County in 2012. On two occasions during the proceedings—in a pretrial hearing on the State's motion in limine and after the examination of Detective Roscoe—the attorneys and the trial court discussed the circumstances of that prior charge. Allegedly, L.D. and her husband were separated at the time of the prior charge and were having marital difficulties, which involved, among other things, L.D.'s drug abuse and her leaving threatening and harassing messages for her husband. L.D. called the Fort Bend County Sheriff's Department to report that her husband intended to commit suicide. Officers were dispatched to where her husband was living with a roommate, and her husband denied attempting or intending to commit suicide. Although L.D. was charged with filing a false report, it is undisputed that the charge against her was dismissed and that she does not have a criminal conviction for filing a false report. The trial court, based primarily on the fact that the charge against L.D. was dismissed and she did not have a conviction, ruled that the prejudicial effect of the prior charge outweighed its probative value and did not allow defense counsel to question Detective Roscoe or L.D. about this prior charge.

As the State points out, although L.D. had previously been charged with filing a false report, that charge had been dismissed for insufficient evidence and thus she

28

had not been convicted of filing a false report. This is therefore not a situation in which the matter could quickly be established by asking L.D. or Detective Roscoe if she had previously been convicted of filing a false report or by introducing a judgment for a false-report conviction. Whether L.D. intentionally made a false report to police officers on this prior occasion has never been established in a criminal proceeding. Thus, for this prior allegation to have any relevance to the truthfulness of L.D.'s statements to police on this occasion regarding appellant's alleged sexual assault of L.D., defense counsel would need to put on evidence concerning the falsity of her prior report, perhaps through the testimony of her husband or the investigating officer of that incident. The trial court reasonably could have concluded that allowing such testimony would confuse and distract the jury from the issue in this case—whether appellant committed aggravated sexual assault of L.D. *See* TEX. R. EVID. 403 (providing that court may exclude relevant evidence if probative value is substantially outweighed by danger of, among other things, confusing issues, misleading jury, or undue delay); *see also* TEX. R. EVID. 401 (providing that evidence is relevant if it has any tendency to make fact of consequence more or less probable than it would be without evidence).

Moreover, because L.D. did not have a criminal conviction for filing a false report, use of the prior charge would violate Rule 608(b)'s prohibition against using specific instances of a witness's conduct to attack the witness's character for

truthfulness. *See* TEX. R. EVID. 608(b); *Hammer*, 296 S.W.3d at 563 (stating that witness's general character for truthfulness may be shown only through reputation or opinion testimony, and may not be attacked by cross-examining witness or offering extrinsic evidence concerning specific prior instance of untruthfulness); *see also Pierson*, 426 S.W.3d at 771–72 (upholding exclusion of prior false accusation of sexual abuse because use of evidence was attempt to impeach on collateral matter and impermissible attack on general credibility with specific instance of conduct). Based on this record and the circumstances involving the prior dismissed charge of filing a false report, we cannot conclude that the trial court's decision to exclude this evidence falls outside the "zone of reasonable disagreement." We hold that the trial court did not abuse its discretion by excluding under Rule 403 the evidence of L.D.'s prior dismissed charge for filing a false report.[7] *See* TEX. R. EVID. 403.

We overrule appellant's second issue.

---

[7] Appellant cites the Court of Criminal Appeals' decision in *Hayden v. State*, 296 S.W.3d 549, 554 (Tex. Crim. App. 2009), for the proposition that otherwise inadmissible evidence may become admissible if a party "opens the door," and, therefore, the State opened the door to L.D.'s prior charge during its questioning of Detective Roscoe. The Court of Criminal Appeals also stated in *Hayden*, in the context of rebuttal evidence, that even if a party opens the door to rebuttal evidence, "the trial judge still has the discretion to exclude the evidence under Rule 403." *Id.*; *Winegarner v. State*, 235 S.W.3d 787, 790–91 (Tex. Crim. App. 2007) (stating that even if witness "opens the door" to otherwise inadmissible evidence by creating false impression of prior troubles with law, trial court may still permissibly exclude evidence under Rule 403).

## Conclusion

We affirm the judgment of the trial court.

Evelyn V. Keyes
Justice

Panel consists of Justices Jennings, Keyes, and Higley.

Do not publish. TEX. R. APP. P. 47.2(b).